IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER IDS BROOKLYN1908, YOLANDA.ADAMS.39, MUJAHID.MUHAMMAD.942 AND JATHIYAH.HOLDER THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK | Case No. ____14-416 M_____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, MATTHEW MILLANE, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Special Agent with the United States Secret Service, and have been for over three years.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C §§ 1344 and 1349 have been committed by Naquan Reyes. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5. Naquan Reyes was employed as a bank teller at Capital One bank for a period in 2008. On or about October 4, 2008, Naquan Reyes was arrested by the New York City Police Department in connection with his participation in a scheme to defraud a bank. He was advised of his Miranda rights, which he indicated he understood and agreed to waive. Reyes then hand wrote a statement that read:

> In the summer June and July of 2008. A man named tank offer me to cash a checks was two people that had an account with Capital One bank. He send one woman name Rosa Johnson. She came to my window and deposit a Capital One check that was made available the same day and she withdrew the money at same time. In result of that Tank, rosa, and myself was given a third of a money. I was given $700. With Angie Corner (?) I was a different branch and tank had Angie come to my window. Angie cash the check against his account he had two forms of I.D. His show me his driver license and debit card. Also Rosa Johnson show her driver license and her debit card. In result I'm very sorry and I'm made an agreement to pay the money and so for I pay up to 40% of the money.

6. Two confidential sources (CS #1 and CS #2) have advised, in part and substance, that in or about 2009, Reyes asked them to allow money to be deposited into their bank accounts in exchange for money and they agreed. They later learned that counterfeit checks were

deposited into their accounts. Bank records confirm that counterfeit checks were deposited into their accounts.

7.  For a period between 2008 and 2009, Reyes was employed as a bank teller at Municipal Credit Union ("MCU"). In or about March 2009, MCU determined that Reyes's employment would be terminated. A report prepared by an investigator at MCU provides in pertinent part as follows:

> When Mr. Naquan Reyes was asked if he had anything at his desk that he would like for us to get for him, he responded that he wanted a few personal items, in addition to a yellow envelope that was on his desk. When the contents of the envelope were inspected to ensure that there was nothing that belonged to the Municipal Credit Union, it was found that Naquan Reyes was in possession of copies of All State checks. The copies of the checks were found to have white out on them deleting information about the payee, the amount of the check, the check number and the claim number. In addition, the envelope also contained a copy of a check with the maker of Prince Carpentry Incorporated. . . . On the afternoon of March 20, 2009, I conferred with Don (Payroll Supervisor) of Prince Carpentry who confirmed that they did have a problem with counterfeit check from January 2009 to February 2009. Also; a third check was in the envelope that had the payee omitted from the check.

8.  In May 2010, counterfeit checks purportedly issued by Forest Construction, Inc. were deposited into a bank account in the name of Crystal Banks. For at least one of the deposited checks, a driver's license for Nicole Thompson was provided as identification. On July 16, 2010, Thompson was arrested. She was advised of her Miranda rights, which she indicated she understood and agreed to waive. Thompson then hand wrote a statement that read:

> I, Nicole Thompson, received checks from Naquan Reyes to deposit into various accounts. I don't where he gets his checks from but he receives all these accounts and from time to time I deposit these checks. He usually gives me from $40 - $100 for dropping checks. I didn't know

> dropping checks was illegal if you doing someone as a favor. I just don't know who supplies him or if he has any partners. Most of the time I deposit it on a Monday or Tuesday. Ones the day is done, he pays me. I deposited about 36 checks up to now at various banks such as TD Bank, Chase, Bank of America, Citibank, MCU. . . . He provides all the checks to me and when he receives checks he types up the names and then we meet up the following day and I deposit the checks.

9. Also in May 2010, counterfeit checks purportedly issued by Forest Construction were deposited into a bank account in the name of Mujahid Muhammed.

10. In June 2010, Reyes received several calls from one or more inmates housed at Otisville FCI, a federal prison. On those telephone calls, Reyes uses coded language to discuss additional "clients" and "accounts" the inmate could find. On one of the calls, he references his girlfriend and says, "That's my, that's the girl who gives me work. Tell her, she work at my old company. That's the girl who gives me work, you know. She asks employees. She look out for me. I look out for her. Tell her, she's the reason what I got my truck. She's good people." Reyes also offered to one of the inmates that he could use Facebook to communicate. Based on my training, experience and knowledge of this investigation, I believe that Reyes was making plans to engage in a bank fraud scheme with these individuals.

11. In July 2010, counterfeit checks were deposited into the MCU bank account for Jathiyah Holder. Specifically, receipts from MCU show that at 3:16 p.m. on July 6, 2010, the counterfeit checks were deposited into Jathiyah Holder's bank account at a branch located at 90-15 Queens Blvd. in Queens. When confronted with this information, Jathiyah Holder advised that Reyes accompanied her to the MCU on July 2, 2010 and could have obtained her bank account information.

12.     I have reviewed telephone records for a cellular telephone used by Reyes in 2010, which reveal on July 6, 2010, at 3:14 p.m. and 3:19 p.m., Reyes made/received telephone calls and/or placed texts within a block of 90-15 Queens Blvd.

13.     In December 2010, six counterfeit checks were deposited into TD Bank accounts in the name of Yolanda Adams.

14.     I have reviewed a publicly available Facebook page for Reyes, using the name "Nay Fly." On the page, I can see that Reyes is currently "friends" with at least three individuals who had counterfeit checks deposited in bank accounts in their names between 2010 and 2011, namely Mujahid Muhammad, Jathiyah Holder and Yolanda Adams.

15.     In May 2011, a bank account for Jane Doe #1, an individual whose identity is known to the affiant, was used to deposit counterfeit checks. Bank surveillance photographs taken within a few days of the deposits depict Naquan Reyes and Jane Doe #1 at an ATM making a withdrawal from Jane Doe #1's bank account. Jane Doe #1 was subsequently arrested and advised of her <u>Miranda</u> rights, which she indicated she understood and agreed to waive. Jane Doe #1 then hand wrote a statement that read:

> Met "Nay" through BeBe Dehaarte he asked if I wanted to make some money. Said he needed my bank acct info I gave him my acct info. Three days later he called me to get money out of my acct. I don't know how it was put in. I never saw any checks or signed any checks. I withdrew the money from the bank which I gave to him and he gave me $500.

16.     In August 2011, a cooperating witness ("CW") advised in sum and substance that Reyes has provided CW with eight counterfeit checks. Subsequent investigation confirmed that the checks were counterfeit. On or about August 23, 2011, law enforcement agents provided

CW with $800 to provide to Reyes for the checks. In a consensually-recorded meeting, Reyes then met with CW, at which meeting CW returned 6 of the checks and provided the $800 for the remaining two checks.

17. Reyes was employed as a bank teller at Wells Fargo for a period in 2013 and 2014. A report prepared by an investigator at Wells Fargo provides the following, in relevant part:

> On 01/10/14, [redacted] received an email from Lead Teller [redacted] (from the 42nd and 3rd location) relaying that a customer, Raphael Ross, [redacted] had been at his store attempting to deposit fraudulent checks. [The lead teller] stated he denied the transaction, upon which Ross got on his phone and then a few minutes later Reyes walked into the branch. Reyes told [the lead teller] to deposit the checks into the account as POD. [The lead teller] told Reyes the checks were fraudulent. Reyes asked to look at the checks and then told [the lead teller] he would go to another branch to do it and left.
>
> Two other Service Managers [SVMs] had emailed the region in regards to this customer (Ross) until the checks were finally caught by another SVM. [The lead teller] confirmed the customer and checks were the same as the [ones] he'd been dealing with Reyes on.
>
> * * *
>
> Reyes also approached another PB [personal banker] in his store and requested that he open an account for his "cousin." This customer was identified as Rousters Hernandez, ECN [redacted]. Account history shows fraudulent checks deposited into this account, too, and are currently overdrawn by a few hundred dollars.

18. On April 16, 2014, a grand jury returned a sealed nine-count indictment charging Reyes with bank fraud and bank fraud conspiracy between 2008 and the present, obstruction of justice murder, three counts of unlawful possession of means of identification and three counts of aggravated identity theft.

19. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.  Facebook users can and often do keep information in their Facebook accounts, including their public and private correspondence with other Facebook users as described below, for long periods of time.

20. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

21. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a

Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

23. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

24. Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

25. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on

Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

26.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

28.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30.  Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

9

31. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

32. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

33. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

34. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

35. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a

Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

36.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

37.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

39. Based on the forgoing, I request that the Court issue the proposed search warrant.

40. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

41. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

42.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation, and potential targets and subjects of the investigation may not be aware that their conduct is part of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

S/ Matthew Millane

MATTHEW MILLANE
Special Agent
United States Secret Service


Sworn to before me this
1st day of May, 2014

S/ Joan Azrack

THE HONORABLE JOAN M. AZRACK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user IDs Brooklyn1908, yolanda.adams.39, mujahid.muhammad.942 and jathiyah.holder that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All Photoprints, including all photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

(d)     All Neoprints, including profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected

    "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The length of service (including start date), the types of service utilized by the user, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. 1344 and 1349 involving Naquan Reyes since 2008, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications between Yolanda Adams, Jathiyah Holder and Mujahid Muhammad and Naquan Reyes.

(b) A conspiracy to defraud banks by depositing fraudulent checks and making subsequent withdrawals.

(c) Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.